UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JENNIFER HERLIHY,

Plaintiff,

-against-

YONKERS PUBLIC SCHOOLS; ANIBAL SOLER, JR., in his official capacity as Superintendent of Yonkers Public Schools; and STEPHANIE McCASKILL, Associate Superintendent of Pupil Services,

Defendants.

---

**COMPLAINT**

**26-Civ-**

**JURY TRIAL DEMANDED**

Plaintiff JENNIFER HERLIHY, as and for her Complaint against Defendants, alleges as follows:

**PRELIMINARY STATEMENT**

1. Plaintiff JENNIFER HERLIHY (hereinafter "Plaintiff" or "Ms. Herlihy") brings this action against her former employer, YONKERS PUBLIC SCHOOLS ("the District"), and the individual defendants, STEPHANIE McCASKILL ("Asst. Superintendent McCaskill"), in her official capacity as Associate Superintendent of Pupil Personnel Services, and ANIBAL SOLER JR. ("Superintendent Soler"), in his official capacity as the Superintendent of Yonkers Public Schools (collectively hereinafter "Defendants"), based upon Defendants' retaliation against Plaintiff in violation of The Rehabilitation Act, 29 U.S.C. § 794, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq*., resulting

1

in Plaintiff's termination of her employment from the District as Director of Special Education.

2. Plaintiff further alleges that also as a result of the retaliation she experienced while employed by the District, Defendants intentionally and with retaliatory motivation failed to hire Plaintiff as a Speech-Language Therapist, and instead, terminated her employment so as to form a legitimate basis to not hire Plaintiff to said position.

3. Plaintiff seeks economic, compensatory, and punitive damages to the extent allowable by law, and other appropriate legal and equitable relief pursuant to federal and state laws.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 1331, as this matter involves federal questions.

5. This action's venue properly lies in the United States District Court for the Southern District of New York, pursuant to 28 U.S.C. § 1391, because a substantial part of the acts or omissions giving rise to this action occurred in this District and Defendants are subject to personal jurisdiction in this District.

## PARTIES

6. Plaintiff JENNIFER HERLIHY is a resident of the State of New York. At all times relevant herein, Plaintiff was the Director of Special Education at Yonkers Public Schools.

7. At all times relevant herein, Defendant YONKERS PUBLIC SCHOOLS is a public school network established and operating under the laws of the State of New York and was Plaintiff's employer.

2

8. At all times relevant herein, Defendant ANIBAL SOLER JR. is the Superintendent of Yonkers Public Schools.

9. At all times relevant herein, STEPHANIE McCASKILL is the Associate Superintendent of Pupil Personnel Services and was in charge of overseeing the Special Education Department, within which was Plaintiff's position as Director of Special Education.

## PROCEDURAL HISTORY AND ADMINISTRATIVE EXHAUSTION

10. As to Plaintiff's state-law-based claims resulting from her termination as Director of Special Education and her non-appointment to Speech Language Therapist, Plaintiff timely filed a Notice of Claim on or about April 30, 2025.

11. Additionally, on or about November 19, 2025, Plaintiff filed an administrative charge of discrimination and retaliation against Yonkers Public School District with the EEOC.

12. On November 25, 2025, the EEOC issued Plaintiff her Right to Sue Letter following without adopting any factual conclusions.

13. Plaintiff now timely commences the instant action.

## STATEMENT OF FACTS

**A.      Facts Relevant to Plaintiff's Retaliatory Termination as Director of Special Education**

14. Plaintiff began her employment with the Yonkers Public Schools ("the District") as the Director of Special Education on or about December 19, 2024.

15. Plaintiff's direct supervisor in her role as Director of Special Education was the Executive Director of Special Education, Ms. Evauna Neville. Both Ms. Neville and Plaintiff operated under the direction and supervision of the District's Associate Superintendent of Pupil

3

Personnel Services, Dr. Stephanie McCaskill (hereinafter "Asst. Superintendent McCaskill.")

16. Shortly after the commencement of Plaintiff's employment with the District, beginning in or about January 2025, Plaintiff noticed numerous federal and state-based special education violations and non-compliance. Put simply, these violations and non-compliance that Plaintiff noticed constituted a denial of the Free and Appropriate Public Education ("FAPE") guaranteed to the District's special education student population through the provisions of the Individuals with Disabilities Education Act, 20 U.S.C. § 1401(9) ("IDEA").

17. These violations and non-compliance included, but was not necessarily limited to, the District's failure to timely conduct initial special education evaluations; the District making improper disability determinations resulting from incomplete evaluations or a complete failure to conduct evaluations; a lack of CSE recommendations and the resulting inability to arrange and provide for appropriate services; neglect of student speech and language needs; delayed implementation of Individualized Education Programs ("IEPs") well outside the 60-day window; and the District's failure to conduct reevaluations, annual reviews, and finalize student IEPs.

18. Throughout her employment, Plaintiff regularly expressed her concerns to her direct supervisor, Ms. Evauna Neville, among others, that numerous, perhaps hundreds, of students were being denied a FAPE by virtue of the District's non-compliance and previously enumerated violations.

19. Given this, on or about February 13, 2025, Plaintiff circulated an email to the Principals of each of the District's approximately 39 schools requesting specific information from each Principal concerning, but not necessarily limited to, those issues identified above.

20. The information Plaintiff requested from the Principals consisted of, at least in part, outstanding Committee on Special Education ("CSE") initial referrals, a list of those students waiting to be placed in appropriate special education programs, and a list of those students who were not receiving any of their mandated related services in violation of state educational requirements and federally mandated IEPs.

21. Plaintiff not only circulated this email to determine what students within the District were not receiving their services and what specific services they were being denied or were being withheld, a form of advocacy in and of itself, but Ms. Herlihy's doing so was also vital to her ability to assist the New York State Department of Education in the Department's attempts to have the District comply with state mandated special education requirements.

22. As to the above point, around the same time that Plaintiff circulated this email amongst the Principals of the various schools within the District, Plaintiff was speaking and collaborating with Ms. Jennifer Bobersky, Regional Associate for the Special Education Quality Assurance for the New York State Education Department. Upon information and belief, Ms. Bobersky was assigned to the District to evaluate, ensure, and potentially enforce compliance with state special education requirements.

23. Shortly after circulating this email and working with Ms. Bobersky, however, around this same time, Asst. Superintendent McCaskill prohibited Plaintiff from continuing to meet with NYSED representatives during their regularly scheduled meeting(s).

5

24. Around the same time that Plaintiff was prohibited from further engaging with Ms. Bobersky, Asst. Superintendent McCaskill also removed Plaintiff's supervisory duties over the District's Special Education Placement Department. Instead, these duties, which fall squarely within the purview of Plaintiff's role as Director of Special Education, were reassigned to Ms. Idalia Aguero, Director of School Counseling.

25. Plaintiff was also excluded from weekly legal team meetings with attorneys for the City of Yonkers, who monitored, advised, and handled legal actions connected to the District's non-compliance with special education requirements.

26. Prior to Asst. Superintendent McCaskill excluding Plaintiff from these meetings, Plaintiff would regularly meet with City attorneys Jennifer LaMarsh and Michelle Klemperer, at least once a week to discuss the status of the District's special education noncompliance, ongoing legal matters, due process complaints, and other concerns raised by students' parents and their advocates and/or attorneys.

27. Irrespective of the duties that had been removed from Plaintiff's oversight, in January, February, and continuing into March, Plaintiff continued zealously advocating for and on behalf of the District's student body who were receiving –or supposed to be receiving– special education services.

28. Plaintiff's advocacy consisted of not only fielding parent calls and interactions on those occasions when they physically came to the District's administrative offices, but also logging their complaints, attempting to remedy or resolve those complaints that were within her control. Plaintiff even went so far as to, on multiple occasions, request meetings designed to set a structure within the Special Education Department, organize efficient

workflow, and "come up with an actual realistic plan to address the 1600 initial referrals [the District] still ha[s] to process."

29. Then, while out on a previously scheduled vacation from March 16, 2025, until March 23, 2025, Plaintiff received an email from Asst. Superintendent McCaskill requesting that she report to HR upon her return to work on or about March 25, 2025.

30. That day, when Plaintiff arrived at work on March 25, 2025, she was immediately met at the door by School Safety Officer Elio Estrella. Safety Officer Estrella escorted Plaintiff to a conference room in the Human Resources Department, where Asst. Superintendent McCaskill was present and waiting for Plaintiff's arrival.

31. During the meeting that ensued, Asst. Superintendent McCaskill presented Plaintiff with a counseling memorandum replete with blatantly pretextual justifications to support an eight (8) week administrative leave. These justifications and information relevant to support Plaintiff's claim that they are pretextual in nature are provided in section (i) that follows.

32. During this same meeting, Asst. Superintendent McCaskill also provided Plaintiff a letter from Superintendent Soler informing Plaintiff that Superintendent Soler would be recommending to the Board that Plaintiff be terminated from the District at the conclusion of the aforementioned administrative leave.

33. As such, from March 25, 2025, until May 23, 2025, Plaintiff was placed on administrative leave. On April 23, 2025, the Yonkers Public Schools' Board of Education voted to adopt Superintendent Soler's recommendation that Plaintiff be terminated from her position as Director of Special Education with the District.

34. This termination of Plaintiff's employment, effective May 23, 2025, was confirmed in a letter dated April 30, 2025, that was sent to Plaintiff following the Board's adoption of the Superintendent's recommendation.

i.      *Information Relevant to Defendants' Pretextual Termination of Plaintiff's Employment*

35. While Plaintiff did receive a counseling memo operating as a de facto termination letter that included multiple reasons allegedly forming the basis for Defendants' termination of Plaintiff's employment, such justifications are either demonstrably false, a mischaracterization of what actually occurred, or contradict earlier directives or assignments provided to Plaintiff.

36. For example, Plaintiff was explicitly told by Asst. Superintendent McCaskill that she was to report to the Executive Director of Special Education, Ms. Evauna Neville.

37. Notwithstanding this fact, in Plaintiff's termination letter, she is alleged to have been "insubordinate" on two occasions for not consulting or speaking with Asst. Superintendent McCaskill.

38. The first is for rearranging the office clerk's work location. The second is for cancelling a previously scheduled meeting because her direct supervisor, Ms. Neville, was not going to be in attendance.

39. Prior to Plaintiff receiving her termination letter, however, with such letter classifying such actions as "insubordination," Plaintiff was never warned, reprimanded, admonished, or disciplined for this during her employment with the District prior to that time at which she was informed of her termination from the District.

40. The District also alleges in Plaintiff's termination letter that she "often expressed confusion about her role and department operations despite several meetings and efforts to outline [my] responsibilities…," yet, as was mentioned previously, Plaintiff explicitly attempted to organize efficient workflow within the District's Special Education Department and "come up with an actual realistic plan to address the 1600 initial referrals [the District] still ha[s] to process."[1]

41. Further evidence of the pretextual nature of this reason for Plaintiff's termination is the fact that, yet again, prior to Plaintiff's actual termination, she was never informed of this alleged shortcoming in her performance, was never warned, either verbally or in writing, nor was she given the opportunity to fix, improve, or correct her alleged shortcomings.

42.  The District also alleged in its counseling memo provided to Plaintiff at the time of her termination that Plaintiff was terminated due to her "lack of responsiveness to parents in a timely manner." This, however, is demonstrably false and on multiple occasions Plaintiff explicitly outlined the issues she was having, including her receipt of emails from angry parents, who on occasion would also "show up at central office…demanding to speak with one of us."[2]

43. Yet again, however, this alleged performance issue, *i.e.*, a lack of responsiveness to parents, was never presented as an issue the District had with Plaintiff prior to her placement on leave and ultimate termination.

44. Instead, Plaintiff, in her approximately 4 months of employment at the District, accrued numerous compliments and positive feedback from parents. These compliments included

---

[1] This language comes from an email Plaintiff sent to her direct supervisor, Ms. Neville and Asst. Superintendent McCaskill during her employment with the District.
[2] This too comes from an email Plaintiff sent to her supervisors.

things such as parents thanking Plaintiff for "listen[ing] to their concerns."[3] "taking the time to speak with [them]."[4]

45. Finally, and in addition to the aforementioned points, Plaintiff never received so much as a single performance evaluation or review in her time at the District.

46. Thus, as can be seen from these points, despite the District's proffered justifications supporting their termination of Plaintiff's employment, such justifications appear to be plainly pretextual rather than founded upon legitimate business reason(s).

47. Moreover, these same points plausibly support Plaintiff's position that her termination as Director of Special Education within the District was retaliatory in nature for her documenting the District's special education shortfalls and attempting to remedy these issues and its impact on the special education student population within Yonkers Public Schools.

**B.    Facts Relevant to Defendants' Retaliatory Failure to Hire Plaintiff as a Speech-Language Therapist**

48. In addition to Plaintiff's alleged retaliatory termination from her position as Director of Special Education, Defendants further retaliated against Plaintiff during her employment with the District by failing to hire Plaintiff as a Speech-Language Therapist.

49. Plaintiff, recognizing the difficulties that existed with respect to helping the special education population of the District from an administrative level, organized what the District classifies as a "courtesy interview" for a Speech-Language Therapist position.

---

[3] Plaintiff received this email from a parent expressing their gratitude on or about January 23, 2025.
[4] Plaintiff received this email from yet another parent on or about February 26, 2025, just about one month before she was terminated in part for her alleged "lack of responsiveness to parents in a timely manner."

50. Admittedly, while there was no Speech-Language position officially posted at the time of Plaintiff's courtesy interview, upon information and belief, because of the projected number of special education students who would need such services for the following academic year (2025-2026), the District permitted Plaintiff to engage in such courtesy interview on or about February 17, 2025, knowing they would have to hire Speech-Language Therapists for the upcoming school year.

51. In fact, as of the filing of this Complaint, the District has, upon information and belief, hired approximately three (3) Speech-Language Therapists or related service providers, either as tenure-track employees or on a long-term substitute basis, since the beginning of the 2025-2026 academic year.

52. Upon information and belief, however, of those hired by the District for these positions, Plaintiff was the most qualified candidate.

53. Looking a bit more closely at the situation, the District's willingness to provide Plaintiff with a complimentary interview appears to indirectly refute their own allegation(s) of Plaintiff's poor performance considering it would appear illogical for such a poor performer to be granted a courtesy interview only to be terminated just a little over a month after Plaintiff was provided such opportunity.

54. Instead, it appears that Plaintiff's termination from the District, in addition to being retaliatory in and of itself, was also done so as to legitimize their decision not to hire her to said position.

55. This is because, upon information and belief, the District has a policy not to rehire individuals who have been previously terminated from the District.

**C.      Defendants' Retaliatory Objection to Plaintiff's Receipt of Unemployment Insurance**

**Benefits**

56. In addition to Defendants' termination of Plaintiff's employment and their failure to hire Plaintiff as a Speech-Language Therapist, Defendants have further retaliated against Plaintiff in the form of contesting her eligibility for New York State Unemployment Insurance Benefits.

57. Specifically, on or about April 7, 2025, Plaintiff filed for Unemployment benefits and shortly thereafter began receiving said benefits.

58. Then, on or about April 30, 2025, Plaintiff filed a Notice of Claim in accordance with multiple New York State statutory requirements, including, but not limited to, General Municipal Law and Education Law.

59. It appears, however, that on or about May 13, 2025, just about two weeks after Plaintiff's filing of her Notice of Claim, Defendants objected and/or contested Plaintiff's entitlement to such benefits.

60. In doing so, Defendants contested Plaintiff's entitlement to Unemployment Benefits by alleging Plaintiff had engaged in "misconduct" sufficient to disqualify Plaintiff from receiving benefits.

61. This basis that the District used to object to Plaintiff's benefits, however, contradicts the District's very own justification(s) provided to Plaintiff in the counseling memo she received from Asst. Superintendent McCaskill, on or about March 25, 2025, which appears to make clear that Plaintiff was terminated for her poor performance.

62. For example, the first line of Asst. Superintendent McCaskill's counseling memo says, "the purpose of the memo is to discuss several concerning incidents involving your *performance* in your current administrative role, as Director of Special Education."

63. The last line of the letter reads, "as discussed more fully above, you have not met these job expectations."

64. Upon Plaintiff's request for a hearing, however, Defendants failed to appear for the hearing conducted on or about October 29, 2025, and Plaintiff was ultimately awarded benefits.

65. Thus, it appears that Defendants' decision to contest Plaintiff's eligibility for benefits, while legally permissible, was retaliatory in nature and qualifies as yet another adverse action Plaintiff experienced at the hands of Defendants.

## AS AND FOR A FIRST CAUSE OF ACTION
## Defendants' Retaliatory Termination of Plaintiff's Employment in Violation of the Rehabilitation Act
## (Against Yonkers Public Schools)

66. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

67. Defendants, through the aforementioned conduct, have violated the Rehabilitation Act by retaliating against Plaintiff for her advocacy on behalf of those special education students within the District who were not receiving mandated educational services.

68. Specifically, Plaintiff, in her role as Director of Special Education, advocated on behalf of special education students who were being denied equal access to mandated services that such students should have been receiving as a result of their disabilities.

69. As a result, Plaintiff suffered damages including, but not necessarily limited to, the termination of her employment as Director of Special Education and the District's subsequent failure to hire Plaintiff as Speech-Language Therapist within the District.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Defendants' Retaliatory Termination of Plaintiff's Employment in Violation of the Americans with Disabilities Act ("ADA")**
**(Against Yonkers Public Schools)**

70. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

71. Defendants, through the aforementioned conduct, have violated the Americans with Disabilities Act by retaliating against Plaintiff for her advocacy on behalf of those special education students within the District who were not receiving mandated educational services.

72. Specifically, Plaintiff, in her role as Director of Special Education, advocated on behalf of special education students who were being denied equal access to mandated services that such students should have been receiving as a result of their disabilities.

73. As a result, Plaintiff suffered damages including, but not necessarily limited to, the termination of her employment as Director of Special Education and the District's subsequent failure to hire Plaintiff as Speech-Language Therapist within the District.

14

**AS AND FOR A THIRD CAUSE OF ACTION**
**Defendants' Retaliatory Termination of Plaintiff's Employment in Violation of the New**
**York State Human Rights Law ("NYSHRL")**
**(against all Defendants)**

74. Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

75. Defendants, through the aforementioned conduct, have violated the New York State Human Rights Law by retaliating against Plaintiff for her advocacy on behalf of those special education students within the District who were not receiving mandated educational services.

76. Specifically, Plaintiff, in her role as Director of Special Education, advocated on behalf of special education students who were being denied equal access to mandated services that such students should have been receiving as a result of their disabilities.

77. As a result, Plaintiff suffered damages including, but not necessarily limited to, the termination of her employment as Director of Special Education and the District's subsequent failure to hire Plaintiff as Speech-Language Therapist within the District.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by Jury.

**PRAYER/DEMAND FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in its favor against Defendants as follows:

A.  A declaratory judgment that Defendants are in violation of the Rehabilitation Act;

15

B.  A declaratory judgment that Defendants are in violation of the Americans with Disabilities Act;

C.  A declaratory judgment that Defendants are in violation of the New York State Human Rights Law;

D.  Awarding Plaintiff compensatory damages (including but not limited to emotional distress damages) and punitive damages (to the extent available);

E.  Awarding Plaintiff costs and reasonable attorneys' fees; and

F.  Such other and further relief as this Court may deem necessary, just, and proper.


Dated:  New York, New York
        February 23, 2026

                                        **GLASS & HOGROGIAN LLP**

                                        By:  _/s/ Michael Donnelly_
                                             Michael T. Donnelly, Esq.
                                             85 Broad Street, 18th Floor
                                             New York, New York 10004

16